**Barton WILSON, et al., Plaintiffs,**

**v.**

**CITY OF LOUISVILLE, Defendant.**

**Civil Action No. C–94–0085–L(H).**

United States District Court,
W.D. Kentucky,
Louisville Division.

March 13, 1997.

Gilbert Hale Nutt, Terry E. Fox, Deborah G. Campbell, Louisville, KY, for Plaintiffs.

Thomas Lukins, City Law Department, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court now has before it the parties' cross-motions for summary judgment. Plaintiffs challenge the constitutionality of Article 11, Section F of the Zoning District Regulations of the Development Code for Jefferson County, Kentucky, as amended by the City of Louisville, Ordinance No. 133, Series 1992 ("the Ordinance"), which restricts certain types of signs, referred to as "small freestanding signs." Plaintiffs say that the Ordinance violates the First, Fifth and Fourteenth Amendments to the United States Constitution, as well as sections 1 and

3 of the Kentucky Constitution and the non-conforming use provisions of KRS 100.253.

The Court must determine whether the free speech and "takings" provisions of the Constitution prevent the City of Louisville from exercising its legislative discretion to improve the aesthetic appearance of the city and to enhance its public safety. After carefully considering the Ordinance and Plaintiffs' objections to it, the Court concludes that the Ordinance does not offend the United States Constitution, the Kentucky Constitution or any Kentucky statutes.

## I.

Plaintiff Barton Wilson owns and operates a business which rents and sells signs to area business and churches. Most of Wilson's inventory consists of signs that measure four by eight feet and have two sides to them. The signs are attached to the ground by twelve inch nails which are driven through the feet of the legs into the ground below. Sometimes this requires drilling on hard surfaces. Plaintiff, Carlisle Baptist Church (the "Church") has owned such a sign for approximately ten years and uses it to promote special events. The sign is located in the Church's front lawn.

The Ordinance can be understood only within the context of the City's comprehensive sign regulation scheme. Article 11 of the Zoning District Regulations of the Development Code for Jefferson County contains comprehensive provisions regulating and restricting the use of signs in Jefferson County. Among the many provisions are those which regulate the use of a class defined as "small freestanding signs." Prior to 1992, both Wilson and the Church's signs were permitted but restricted as small freestanding signs. On July 15, 1992, the Louisville Board of Alderman passed the Ordinance, which fur-

ther restricted the use of small freestanding signs within the city limits only by (1) reducing their maximum allowable size from thirty-two to eight square feet; (2) reducing their maximum allowable extension above the ground from nine feet to four feet; and (3) limiting the hours of display for permitted signs to the hours of business, profession, trade or occupation lawfully practiced on site.[1] In addition, the Ordinance adds a definitional section, explaining that: "Small freestanding sign shall mean any sign which is unattached to any structure or the ground." In essence, by reducing the allowable size of small freestanding signs, the Ordinance effectively prohibits the use of larger temporary signs. Plaintiffs challenge the constitutionality of this Ordinance.

In compliance with the statute for amending zoning regulations, the Director of Law for the City of Louisville referred the proposed ordinance to the Louisville and Jefferson County Planning Commission. The Planning Commission took testimony regarding the proposed ordinance at two public hearings and transcribed the testimony. On March 18, 1993, the Planning Commission adopted findings, which stated that the proposed ordinance "would further enhance and protect the community from visual nuisances and safety hazards to vehicular traffic caused by the currently permitted larger signage," and unanimously recommended that the Board of Aldermen adopt it. On July 13, 1993, the Board of Aldermen enacted the Ordinance, and the Ordinance was signed by Mayor Jerry Abramson two days later.

The Ordinance was scheduled to go into effect January 15, 1994, six months after its enactment. However, Jefferson Circuit Court Judge Geoffrey Morris issued a Restraining Order on January 14, 1994, enjoining the City of Louisville from taking any

1. The Ordinance provides, in part, as follows:
"Small freestanding sign" shall mean any sign which is unattached to any structure or the ground.
(1) The small freestanding sign shall not exceed eight (8) square feet of surface area per face and there shall be no more than two (2) faces. The sign shall not extend more than four (4) feet above the ground on which it is placed.

(2) The small freestanding sign shall advertise only the business, profession, trade or occupation lawfully practiced on site and/or the generic or brand name products or services lawfully available on site, or religious, charitable, or other non-commercial messages. Display of small freestanding signs shall be limited to the hours of operation of the business, profession, trade or occupation lawfully practiced on site.

action to implement, enforce or otherwise require compliance within the City of Louisville. That Restraining Order remains in effect today.

## II.

Plaintiffs primarily argue that the Ordinance amounts to a violation of free speech, as protected by the First and Fourteenth Amendments to the U.S. Constitution, by prohibiting a means of communicating both commercial and non-commercial speech. Before beginning the analysis, this Court must determine which of the First Amendment tests to apply here. Plaintiffs say that the "strict scrutiny" test should be applied, while Defendant argues that the "time, place and manner" analysis is more appropriate.

■ The strict scrutiny analysis applies where a statute or regulation threatens to suppress the expression of particular ideas or viewpoints. *Leathers v. Medlock*, 499 U.S. 439, 447, 111 S.Ct. 1438, 1443–44, 113 L.Ed.2d 494 (1991). The Ordinance is not content-based. Plaintiffs do not claim that it is. The Ordinance regulates the size and placement of portable signs without reference to their content. *See Cleveland Area Board of Realtors v. City of Euclid*, 88 F.3d 382, 387–88 (6th Cir.1996) ("[B]ecause Euclid's 'time, place, and manner' restriction on signs is justified on the basis of aesthetics without reference to the content of the signs, it must be considered content-neutral under *Renton* and *O'Brien*."). Therefore, the strict scrutiny test is not appropriate here.

■ Nor does the Ordinance limit its scope to commercial signs. Therefore, the commercial speech test laid out in *Metromedia* is also inapplicable. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981). The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner. *Wheeler v. Commissioner of Highways*, 822 F.2d 586, 589 (6th Cir.1987). Where a regulation indirectly affects speech, without reference to the content of the speech, the Court must inquire as to whether the Ordinance: (1) is in furtherance of substantial state interests; (2) directly advances those interests; (3) has an effect on speech no greater than necessary to accomplish the City's purpose; and (4) leaves open alternate modes of communication. *See Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805, 812, 104 S.Ct. 2118, 2129, 2132, 80 L.Ed.2d 772 (1984). The Court will address each of these concerns.

## A.

■ The Supreme Court has found that the government has a substantial interest in promoting the safety and aesthetics of its cities. *See Vincent*, 466 U.S. at 807, 104 S.Ct. at 2130; *Metromedia*, 453 U.S. at 507–08, 101 S.Ct. at 2892–93. In the present case, the Louisville and Jefferson County Planning Commission held two public hearings and took testimony regarding the Ordinance. At the hearing, William P. Schreck, Director of the Department of Inspection, Permits and Licenses for the City of Louisville and the chief zoning enforcement officer for the City, testified and displayed slides depicting the large number of thirty-two square foot portable signs in Louisville and the resulting sense of clutter. Mr. Schreck also testified and presented slides regarding the dangers associated with the illuminated portable signs. Other witnesses testified as to issues of aesthetics and safety. As a result, the Planning Commission found that the Ordinance, as amended, "would further enhance and protect the community from visual nuisances and safety hazards to vehicular traffic caused by the currently permitted larger signage." Plaintiffs concede that aesthetic and safety concerns motivated the amendments. Defendant has shown, therefore, substantial government interests.

## B.

The Ordinance must directly advance the asserted goals of aesthetics and safety. The Supreme Court in *Metromedia* explained that where the source of the problem has been identified—here, the prohibited signs—the "the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Metrome-*

*dia,* 453 U.S. at 508, 101 S.Ct. at 2892. The Ordinance does just that.

The Supreme Court also emphasized the importance of deferring to the decisions of the local lawmakers regarding the source of the problems and the most effective way to deal with them. In *Metromedia,* the Court explained:

> We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety.

*Metromedia,* 453 U.S. at 509, 101 S.Ct. at 2893. Where the Planning Commission's conclusions are "not manifestly unreasonable," this Court should not set aside the resulting decisions. *Id.*

·Finally, it should be noted that the Ordinance need not entirely eliminate all safety and aesthetic problems in order to have directly advanced its interests. As the *Metromedia* court explained, whether the Ordinance directly advances the interests it asserts "is not altered by the fact that the ordinance is underinclusive." *Metromedia,* 453 U.S. at 511, 101 S.Ct. at 2894. *See also Vincent,* 466 U.S. at 811, 104 S.Ct. at 2132 (explaining that "the validity of the aesthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property").

### C.

Defendant also must show that the Ordinance is no broader than necessary, that is, that it is narrowly tailored to meet its interests of safety and aesthetics. *See Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 654, 101 S.Ct. 2559, 2563–64, 2567, 69 L.Ed.2d 298 (1981). As the Supreme Court noted in *Metromedia,* "[if] the city has sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Metromedia,* 453 U.S. at 508, 101 S.Ct. at 2892. In *Vincent,* the Court noted that where "the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself," a total ban "curtails no more speech than is necessary to accomplish its purpose." *Vincent,* 466 U.S. at 810, 104 S.Ct. at 2131. Similarly here, the Planning Commission specifically found that the prohibited signs were unattractive and constituted safety hazards. Consequently, their prohibition is the most direct method of addressing the government's interests in safety and aesthetics.

The Sixth Circuit recently has held that a total ban on residential yard signs with minimal exceptions "burdened substantially more speech than necessary, because it completely foreclosed an inexpensive and autonomous way to communicate." *Cleveland,* 88 F.3d at 388. However, unlike the case in *Cleveland,* the ban on portable signs of a specific size does not "completely foreclose" an inexpensive method of communication. Various other avenues are available to Plaintiffs, as discussed in Section II.D. The availability of alternative avenues of communication, however, is not determinative on this issue. If the Planning Commission identifies certain portable signs as creating a visual blight, then to ban those signs entirely is not excessive on its face. Whether or not this ban leaves other avenues of communication open is a separate inquiry.

### D.

"While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places … a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Vincent,* 466 U.S. at 812, 104 S.Ct. at 2132. The Supreme Court has interpreted this requirement liberally. In *Vincent,* the court noted that a prohibition against posting signs on public property "does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited." *Vincent,* 466 U.S. at 812, 104 S.Ct. at 2132. Applying similar reasoning here, Plaintiffs still have adequate alternative modes of communication available to them. Plaintiffs can distribute flyers and

send out leaflets. In addition, the Ordinance only prohibits small freestanding signs of a certain size. Plaintiffs may still use smaller portable signs as well as larger permanent signs. As Defendant notes, there is no evidence in the record that users of larger portable signs cannot adequately convey their messages on smaller portable signs, or by any other method of communication.

■ The Court's four-part analysis leaves little doubt that. considering the Supreme Court's criteria, the Ordinance does not offend constitutional principles.[2]

### III.

Plaintiffs also claim that the Ordinance effects an unconstitutional taking without just compensation, under the Fifth and Fourteenth Amendments. The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." *Dolan v. City of Tigard,* 512 U.S. 374, 383–84, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994). Plaintiffs say that the Ordinance constitutes a taking because under the Ordinance, Wilson could no longer lease his signs in Louisville and the Church could not use the sign on its property.

When Justice Holmes first recognized that a government regulation could constitute a Fifth Amendment taking in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), he did not explain precisely how far the regulation would have to go to do so. Ever since, the Supreme Court has struggled to develop a consistent approach to individual cases in which regulations deprive property owners of some use or value of their property. In *Agins v. City of Tiburon,* the Court explained that a zoning ordinance effects a taking if: (1) it does not substantially advance legitimate state interests; or (2) it denies an owner economically viable use of his property. 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). However, the application of this test has been difficult. Justice Scalia, among others, conceded that the Court has generally eschewed any set formula and has engaged in essentially ad hoc factual inquiries. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992); *see also* Katherine Dunn Parsons, Comment, *Billboard Regulation After Metromedia and Lucas,* 31 Hous.L.Rev. 1555, 1581–1605 (1995).

■ With regard to the first part of the test, the Court must determine whether the asserted interests of the regulation are substantial and whether the means to achieve those interests are reasonable. The Court has already determined that the Ordinance properly meets both of these criteria. *See Agins,* 447 U.S. at 261, 100 S.Ct. at 2141–42 (holding an ordinance which aided the preservation of open space was a valid exercise of the city's police power to protect its citizens against the ill effects of urbanization and advanced a legitimate governmental purpose).

The application of the second part is more problematic. To assess economic viability, it appears as though the Supreme Court actually balances a number of factors, such as the character of the governmental action,[3] the

---

**2.** Plaintiffs also assert that the Ordinance impermissibly deprives Plaintiffs of liberty and property without due process of law, in violation of the Fourteenth Amendment. According to the Supreme Court in *Metromedia,* the Due Process Clause does not afford a greater degree of protection than does the First Amendment:

Since we hold that the First Amendment interests [in this case] are not sufficient to prevent the city from [enforcing its ordinance], no different result should be reached under the Due Process Clause.

*Metromedia,* 453 U.S. at 521 n. 25, 101 S.Ct. at 2899 n. 25.

Since the Ordinance is not in conflict with the First Amendment, this Court may conclude without extensive analysis that the Ordinance does not violate the Due Process Clause of the Fourteenth Amendment.

**3.** According to the Supreme Court, "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government...." *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Court will not dwell on this factor except to note that this is not a case of a physical invasion of Plaintiffs' property.

harshness of the taking, the valid investment-backed expectations of the property owner and whether the burden and benefit of the public action are shared by the property owner, in making this determination. *See Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

### A.

After reviewing the record the Court concludes that the Ordinance does not deprive Wilson of economically viable use of his property. Approximately 80% of Wilson's business is conducted outside of Louisville, in the remainder of Jefferson County, which is not covered by the Ordinance. Since his signs still may be leased in the county or outside of it, Wilson has the option of marketing the remaining 20% of his inventory to customers in those areas. In addition, Wilson could sell his inventory to someone who may use it elsewhere. Even if he could not do so, a 20% decrease in the value of his inventory does not necessarily constitute a taking. *See Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("[A] reduction in the value of property is not necessarily equated with a taking.").

When an owner shows a diminution in the value of his property resulting from the city's exercise of police powers, courts typically look to see if the benefits and burdens of the regulation are shared by other owners in the community. *Agins,* 447 U.S. at 262, 100 S.Ct. at 2142. In the present case, Wilson will share the burden as well as the benefits of the Ordinance: Wilson is not the only owner precluded from using his signs and he, along with the others, will benefit from the improved aesthetic appearance of the city as well as the improved safety of the traffic.

■ Whether a regulation deprives an owner of economically viable use of its property is admittedly an imprecise determination. It is clear, however, that the Court should also consider "whether the interference with [the owner's] property is of such a magnitude" that the state must compensate him for its loss in value. *Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665. In doing so, the Court should view the owner's property

as a whole, not in parcels. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987). Therefore, the focus should be on whether Wilson can glean a profit from his entire inventory of signs rather than the 20% marketed to Louisville customers.

In considering the magnitude of the city's interference with the owner's property, the *Penn Central* Court found that the interference was not significant enough to require compensation because, first, the regulation allowed the owner to continue to use the property as it had been used for the past 65 years, hence not interfering with the owner's primary expectation concerning use of the property, and, second, the regulation allowed the owner to continue to profit and obtain a reasonable return from the use of the property. *Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665. Similarly here, the Ordinance allows Wilson to continue leasing and selling his signs outside of Louisville and since Wilson can continue to make a profit on his signs, the Ordinance does not render Wilson's business commercially impracticable. Therefore, the Ordinance does not interfere with Wilson's property to such a degree as to require just compensation.

Furthermore, the Court in *Andrus v. Allard* noted that, "Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking." 444 U.S. at 67, 100 S.Ct. at 327. *See also Penn Central,* 438 U.S. at 126, 98 S.Ct. at 2660 (listing cases in which laws prohibiting the continuation of otherwise lawful businesses were upheld against takings challenges). The Supreme Court has stated that the government has the right to regulate the marketing and use of property, even to the detriment of the property's owner. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1006, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (holding that the plaintiff did not have "a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself").

Recently, the Supreme Court stated in dicta that a regulation could render personal property valueless without constituting a

taking, explaining that an owner of personal property should be aware of the possibility of new regulation which may render its property worthless because of the State's traditionally high degree of control over commercial dealings. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 2899–2900, 120 L.Ed.2d 798 (1992). This reasoning applies to the regulation of signs. Signs, including the ones sold and leased by Wilson, were regulated prior to the Ordinance. Wilson had no right to assume that the sign regulations would remain unchanged. Therefore, even if the Ordinance rendered all of Wilson's signs worthless, it is questionable whether it would constitute a taking. In these circumstances Defendant may regulate the use of signs without having to compensate the owners.

The Supreme Court has also expressed a reluctance to base a takings claim on the loss of future profits. *See Andrus,* 444 U.S. at 66, 100 S.Ct. at 327 ("At any rate, loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim.... Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests."). Wilson's anticipated loss of future profits from his Louisville customers is highly speculative considering the uncertainty as to whether they would have continued leasing from him absent the Ordinance and whether he will be able to redirect his entire inventory to non-Louisville customers. It would seem that Wilson's interest in anticipated profits from his Louisville customers is too speculative to support a Fifth Amendment takings claim.

B.

■ The question of whether a taking has occurred is slightly different with regard to the Church. Unlike the analysis of Wilson's claim, the Court cannot concentrate on the commercial use and profit interests surrounding the Church's sign, but must focus on the Ordinance's effect on the use and value of the sign to the Church. As with Wilson, the Court concludes that the Ordinance cannot be deemed a taking as to the Church under the Supreme Court's current jurisprudence.

Under the Ordinance, the Church is left with at least one economically viable use for its sign—it can sell it to someone who lives outside of Louisville, and who has some non-restricted use for it. Other circuits have held that as long as property remains sufficiently desirable to permit its owner to sell it on the open market for its intended use, no regulatory taking has occurred. *See, e.g., Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422, 1433 (9th Cir. 1996); *Park Ave. Tower Assoc. v. City of New York,* 746 F.2d 135, 139 (2d Cir.1984). In this case it is unclear whether the Church would suffer any diminution in the value of its sign since the Ordinance has not affected its desirability with regard to those living outside the Ordinance's jurisdiction.

Even if the Church could not sell its sign, it is questionable whether the Ordinance would constitute a taking. As noted above, the Supreme Court has stated that it is unlikely that an owner of personal property who has a reasonable expectation that its property will be regulated, or regulated further as is the case here, would have a takings claim. *See Lucas,* 505 U.S. at 1027–28, 112 S.Ct. at 2899–2900. Cities must be allowed to regulate in pursuit of legitimate public goals. Regulation inevitably impinges on the private rights of its citizens. If a city were required to reimburse every citizen for every regulation which resulted in economic loss for that citizen, the city essentially would have to regulate by purchase. *Andrus,* 444 U.S. at 65, 100 S.Ct. at 326–27. Government would be stifled if it were required to pay for each change in law. *See Pennsylvania Coal v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). As the Supreme Court noted in *Penn Central,* " 'taking' challenges have also been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." *Penn Central,* 438 U.S. at 125, 98 S.Ct. at 2659. Simi-

larly here, the Ordinance should not be deemed a taking simply because it prohibits a beneficial use of the Church's sign. Like Wilson, the Church will share the burdens and the benefits of the Ordinance with other sign owners.

The *Lucas* Court held that, "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027, 112 S.Ct. at 2899. That is, a regulation does not constitute a taking where the government "takes" an interest the owner did not acquire within its bundle of ownership rights. In this case, the Church never acquired the right to use its sign in the face of a regulation advancing the legitimate state goals of safety and aesthetics. In fact, the Church purchased its sign in the face of the numerous regulations governing it. As with Wilson, the Church did not purchase the right to be exempted from those regulations or from any subsequent changes to those regulations. Therefore, as is the case with Wilson, the Church's takings claim must be dismissed.

### IV.

Plaintiffs assert that the Ordinance is tailored in such a way as to circumvent the protection given in KRS 100.253 to existing nonconforming uses, placing the Ordinance in direct conflict with Kentucky law. An ordinance which conflicts with a Kentucky statute is invalid. *See City of Harlan v. Scott,* 290 Ky. 585, 162 S.W.2d 8, 9 (1942) ("An ordinance may cover an authorized field of local laws not occupied by general laws but cannot forbid what a statute expressly permits and may not run counter to the public policy of the state as declared by the Legislature."). However, in the Court's view, the Ordinance does not conflict with the statutory definition of nonconforming uses.

The nonconforming use statute provides that:

> The lawful use of a building or premises, existing at the time of the adoption of any zoning regulations affecting it may be con-

tinued, although such use does not conform to the provisions of such regulations, except as otherwise provided herein.

*See* KRS 100.253(1). The zoning regulations attempt to exclude the use of small freestanding signs from the protection of this statute by stating that:

> For purposes of KRS 100.253 small freestanding signs shall be regarded as personal property unattached to the real property on which they are placed and such signs are not structures and no nonconforming land use rights shall attach to them.

The Kentucky statute which defines nonconforming uses does not explicitly depend on this distinction between personal property which is attached to the ground and that which is unattached. According to Kentucky law, a "nonconforming use or structure" means:

> [A]n activity or a building, sign, structure or portion thereof which lawfully existed before the adoption or amendment of the zoning regulation, but which does not conform to all of the regulations contained in the zoning regulation which pertain to the zone in which it is located.

KRS 100.111(13). However, the definition of "structure," which explicitly includes signs under its rubric, does make a distinction between permanent and non-permanent structures. According to the statute, a structure is:

> [A]nything constructed or made, the use of which requires *permanent location* in or on the ground or attachment to something having a permanent location in or on the ground, *including buildings and signs.*

KRS 100.111(21) (emphasis added). Thus, the Ordinance's reason for excluding small freestanding signs from the definition of a nonconforming use, seems to be valid.

In addition, the purpose behind allowing non-conforming uses is to prevent excessive hardship on those whose permanent structures no longer conform to the law. This concern is not implicated with property which is temporary and which easily can be

made to conform with the new zoning regulations. Therefore, the language of the Ordinance appears to be in keeping with the intent of the legislature in separating out permanent structures for protection.

The small free-standing signs at issue here, while technically attached to the ground, are not permanent: they do not require permanent location in or on the ground, they are only attached to the ground by 12–inch stakes and they are marketed for their portability. Since the small freestanding signs are not permanent, they are not protected under KRS 100.253 as non-conforming uses.[4]

### V.

Plaintiffs claim that the Ordinance is void for vagueness. In particular, they claim that a "small freestanding sign," which is defined as "any sign which is unattached to any structure or the ground" is insufficient to give an individual of ordinary intelligence a reasonable opportunity to know what is prohibited. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2300, 33 L.Ed.2d 222 (1972) (laying out the standard for vagueness). However, when examining an ordinance for vagueness, courts must look at the ordinance as a whole. *See id.; see also Schenck v. Pro–Choice Network of Western New York,* — U.S. —, —, 117 S.Ct. 855, 869–70, 137 L.Ed.2d 1 (1997).

Article 11 of the Zoning District Regulations deals with every type of outdoor sign. By process of elimination, it is clear that Section F applies to Plaintiffs' signs. Even if this were not the case, the text of Article 11 is followed by a series of illustrations to guide those who are still unclear about the applicability of the sections. In particular, Illustration No. 14 depicts "small freestanding signs" in such a way as to make it clear that it includes Plaintiffs' signs. Finally, owners of sign businesses such as Plaintiff Wilson's, attended the public hearings regarding the proposed Ordinance, which seems to indicate that it was clear to those owners which signs the Ordinance would cover.

### VI.

Finally, Plaintiffs claim that the Ordinance violates their right to equal protection under sections 1 and 3 of the Kentucky Constitution, presumably because the Ordinance singles out Plaintiffs' signs to be prohibited. In order to apply the proper level of scrutiny to Plaintiffs' equal protection claims, this Court must determine whether (1) Plaintiffs belong to a suspect class or (2) the Ordinance burdens a fundamental right. *See Transportation Cabinet v. Feige,* 889 S.W.2d 52, 54 (Ky.Ct.App.1994). Plaintiffs have not alleged that they belong to a suspect class and, as discussed above, the Ordinance burdens neither Plaintiffs' fundamental right of free speech nor Plaintiffs' fundamental right to just compensation for a taking of property. Plaintiffs allege the infringement of no other fundamental rights. As a result, this court must apply a rational basis test to determine whether the Ordinance violates sections 1 and 3 of the Kentucky Constitution. *Hooks v. Smith,* 781 S.W.2d 522, 523 (Ky.Ct.App. 1989). The rational relationship level of scrutiny has traditionally been applied to determine whether a zoning regulation violates an individual's equal protection guarantees. *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354, 1360 (6th Cir.1992).

The Planning Commission based its decision to amend on two separate public hearings in which opponents and proponents of the proposed amendments testified. The

---

4. Other jurisdictions have arrived at similar results. *See, e.g., New Castle County v. Harvey,* 315 A.2d 616, 619 (Del.Ch.1974) (holding that use of a lot for temporary parking was not a valid nonconforming use); *State of New Jersey v. Gargiulo,* 103 N.J.Super. 140, 246 A.2d 738, 742 (1968) ("While business signs may attain the status of nonconforming uses ... the temporary use of a sign or banner ... does not amount to a nonconforming use which may be continued after enactment of an ordinance."). *See also* Wis. Stat. § 59.69(10)(a) (1996) ("[T]he continuance of the nonconforming use of a temporary structure may be prohibited").

Commission adopted findings which held that the proscribed portable signs were detrimental to both the aesthetics and safety of the city. It is not the role of the judiciary to question the findings and conclusions of a legislative body responsible for such decisions; it is enough that the Commission acted rationally based on those findings. Given the Commission's findings, the ban on the proscribed signs is the most direct way to achieve the legitimate goals of aesthetic improvement and safety.[5] As a result, this Court must conclude that the Ordinance was rationally related to those goals and, consequently, that the Ordinance does not violate the Kentucky Constitution.

The Court will issue an order consistent with this Memorandum Opinion.

### ORDER

The Court has considered the parties' motions for summary judgment and has filed a Memorandum Opinion. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED;

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Complaint is DISMISSED with prejudice.

This is a final and appealable order.

---

**5.** The rational basis standard used by Kentucky courts is extremely deferential, as evinced by the language used in *Hooks:* "It is certainly not beyond reason that the legislature would deem it advisable" to act as it did. *See Hooks,* 781 S.W.2d at 523.